**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Heriberto Nanez HUERTA, Defendant-Appellant.**

No. 76–1530.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Nov. 9, 1976.

Decided Jan. 11, 1977.

David L. Russell, U. S. Atty., and Charles Lee Waters, Asst. U. S. Atty., Oklahoma City, Okl., on briefs, for plaintiff-appellee.

Joseph P. Constantine, Denver, Colo., on briefs, for defendant-appellant.

Before LEWIS, Chief Judge, and PICKETT and SETH, Circuit Judges.

PICKETT, Circuit Judge.

Appellant Huerta was convicted of distributing heroin, a Schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1). On appeal he contends that the evidence is insufficient to sustain the conviction and that the statutory schedules defining controlled substances as set forth in 21 U.S.C. § 812 are ineffective because of the failure of the Attorney General of the United States to republish the schedules as required by that section. A study of the record convinces us that the evidence and inferences to be drawn therefrom are sufficient to sustain the verdict, and that the claim that the schedules are invalid is without merit.

■ The evidence shows that on January 6, 1976, correctional officers at the El Reno, Oklahoma Federal Reformatory received a tip from a confidential source that there was a quantity of heroin in one of the dormitories of the institution which would be distributed that evening. The dormitory was divided into small rooms with walls about five feet high. These were referred to as "cubicles" and were occupied by individual inmates who were confined in the institution. After receipt of the information, a correctional officer secreted himself in an attic above the dormitory where he had full view of the cubicles. He observed three inmates, including Huerta, enter the cubicle occupied by inmate Hernandez. Later, two other inmates arrived. Huerta then placed a pane of glass on a shelf in the cubicle and emptied the contents of a small red package onto the glass. The substance was divided into five portions, one of which was dissolved in a small metal container where it was heated and extracted through a needle into a plastic syringe. Huerta proceeded to inject the contents of the syringe into the arm of one of the other inmates. This procedure was followed until the five portions were disposed of. The gathering then dispersed, with Huerta and inmate Sierra moving to the cubicle occupied by Huerta. There Huerta was observed placing a small red package into a slit in the fly of his trousers. Other officers were notified, and as Huerta and Sierra left the dormitory, they were detained, taken to the supervisor's office and searched. Two small red packages were found enclosed in the fly of Huerta's trousers. The packages contained heroin. A hypodermic syringe

and two needles were located in the same area of Sierra's trousers. Traces of heroin were found in the syringe. No other syringe was found. This uncontradicted evidence, direct and circumstantial, is ample to sustain the jury's verdict. *United States v. Crocker,* 510 F.2d 1129 (10th Cir. 1975); *United States v. Downen,* 496 F.2d 314 (10th Cir.), cert. denied, 419 U.S. 897, 95 S.Ct. 177, 42 L.Ed.2d 142 (1974); *United States v. Addington,* 471 F.2d 560 (10th Cir. 1973).[1]

The Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801 et seq., established five schedules of drugs and controlled substances known as Schedules I, II, III, IV and V. In these schedules were listed the initial substances to be controlled. Section 812(c) of the Act provided that the five schedules "shall, unless and until amended pursuant to section 811 of this title, consist of the following drugs or other substances, by whatever official name, common or usual name, chemical name, or brand name designated. . ." Section 811 of the Act provides a procedure by which the Attorney General of the United States may by rule add to or remove from a schedule a controlled substance, or may rearrange them within the schedules. Section 812(a) states:

> . . . The schedules established by this section shall be updated and republished on a semiannual basis during the two-year period beginning one year after the date of enactment of this subchapter and shall be updated and republished on an annual basis thereafter.

Apparently, the schedules have not been published strictly as required by statute. It is contended by appellant that since the schedules were not updated and republished within the time required by the statute, they lapsed and thereafter were ineffective. In other words, the contention is that the failure to republish the schedules resulted in a decontrol of all the substances initially specified in the statutory schedules.

The obvious purpose of Section 812 was to include in the five schedules all of the substances which were then to be controlled. That section of the Act states that "[s]uch schedules shall initially consist of the substances listed in this section." We are convinced that the clear intent of Congress was that the schedules should remain as initially adopted until changed by action of the Attorney General. The required republication of the schedules was to keep the public advised of any changes that had been made in the schedules. We cannot attribute to Congress an intention to create a situation whereby the failure of the Attorney General to republish the schedules would, in effect, nullify the Act. We hold that the failure to publish the "updated" schedules as required by Section 812(a) had no effect upon the validity of those substances initially listed in the five schedules. Those substances, unless removed by action of the Attorney General, continued to be controlled substances regardless of publication. After full discussion, this conclusion was reached in *United States v. Monroe,* 408 F.Supp. 270 (N.D.Cal. 1976), and *United States v. Andrews,* 408 F.Supp. 1007 (N.D.Cal.1976). We do not decide whether control of a substance added to the initial schedules becomes effective before publication.

AFFIRMED.

---

1. The rule as to the sufficiency of the evidence to sustain a jury verdict in a criminal case is stated in *United States v. Addington, supra* at 563, as follows:

    In determining whether the evidence is sufficient to support a jury verdict of guilty we must view the proof in the light most favorable to the Government to ascertain if there is sufficient substantial evidence, direct and circumstantial, together with the reasonable inferences therefrom, from which the jury might find the defendant guilty beyond a reasonable doubt. . . .